**B–T DISSOLUTION, INC., and Steven S. Matthews, Plaintiffs,**

v.

**PROVIDENT LIFE AND ACCIDENT INSURANCE CO., and Guardian Life Insurance Company, Defendants.**

No. C–3–98–225.

United States District Court,
S.D. Ohio,
Western Division.

Feb. 23, 2000.

Deborah Davis Hunt, Karl R. Ulrich, Sebaly, Shillito & Dyer, Dayton, OH, Jennifer J. Walters, Huffman, Landis, Weaks & Lopez, Troy, OH, George Lovett, Lovett & Lovett Co., LPA, Tipp City, OH, for plaintiffs.

William Robert Ellis, Carl John Schmidt, III, Wood & Lamping, Cincinnati, OH, Thomas Andrew Young, Marjorie Lee Crowder Briggs, Porter, Wright, Morris & Arthur, Columbus, OH, Jonathan Hollingsworth, Porter, Wright, Morris & Arthur, Dayton, OH, Linda Sue Holmes,

Schuck Law Office, Findlay, OH, for plaintiffs.

DECISION AND ENTRY OVERRULING MOTION FOR SUMMARY JUDGMENT (DOC. # 27), FILED BY DEFENDANT PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY; MOTION FOR SUMMARY JUDGMENT (DOC. # 28), FILED BY DEFENDANT GUARDIAN LIFE INSURANCE COMPANY OVERRULED; CONFERENCE CALL SET

RICE, Chief Judge.

This litigation stems from events surrounding Plaintiff Steven Matthews' resignation from his position as a managerial employee and minority shareholder of Plaintiff B–T Dissolution, Inc. ("B–T").[1] After his resignation, Matthews sought to recover disability benefits under separate insurance policies issued to him by Defendants Provident Life and Accident Insurance Company ("Provident") and Guardian Life Insurance Company ("Guardian").[2] Upon Matthews' resignation, and in accordance with the terms of his employment agreement, B–T redeemed his stock in the company. B–T then filed a claim under its own "Business Buy–Back Disability" insurance policy with Provident, seeking indemnification for the cost of its stock repurchase. Provident and Guardian initially paid Matthews' claims for benefits, but they stopped making the payments after determining that he was not "disabled," within the meaning of the policies. As a result of that finding, Provident also refused to pay B–T's claim under its "Business Buy–Back" insurance policy. B–T and Matthews subsequently filed suit in state court, seeking a declaratory judgment and asserting claims for breach of contract and bad faith. (Complaint, attached to Notice of Removal, Doc. # 1). The Defendants removed the action to this Court on June 2, 1998, alleging the existence of (1) diversity jurisdiction and (2) federal question jurisdiction, on the basis that the Plaintiffs' state law claims are completely preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* Pending before the Court are Motions for Summary Judgment (Doc. # 27, 28), filed by Provident and Guardian. In their Motions, the Defendants allege that the insurance policies at issue are part of an employee welfare benefit plan which is governed by ERISA. Consequently, they argue that the Plaintiffs' state law claims are completely preempted and, therefore, that they are entitled to summary judgment on such claims.[3]

---

1. At the time of Matthews' resignation, B–T was known as Tube Products Corporation, which formerly was known as TPC Acquisitions, Inc. For purposes of the Court's analysis, *infra*, these name changes have no significance. As a result, the Court will refer to the company hereinafter as "B–T."

2. The specifics of Matthews' alleged disability need not be discussed herein, because they are not relevant to the issues raised in the pending Motions for Summary Judgment.

3. The Defendants appear to recognize, however, that if the Plaintiffs' state-law claims are "completely preempted" by ERISA, then regardless of the language employed in the Complaint, those claims must be construed as setting forth claims for ERISA plan benefits under 29 U.S.C. § 1132(a)(1)(B). *See, e.g.,* Motion for Summary Judgment filed by Defendant Guardian, Doc. # 28 at 13 (arguing that Matthews' state-law claims are, in reality, "claims for recovery under an ERISA plan"). The Sixth Circuit has recognized that "in order to come within the [complete preemption] exception [for removal,] a court must conclude that the common law or statutory claim under state law should be characterized as a superseding ERISA action...." *Warner v. Ford Motor Co.,* 46 F.3d 531, 534 (6th Cir. 1995). As a result, the Defendants would be entitled to summary judgment on the Plaintiffs' state-law claims, *as pled.* It would defy logic, however, for the Court to allow removal on the basis that the Plaintiffs' Complaint contains federal causes of action, *arising under* ERISA from their inception, and then to grant summary judgment and enter final judgment against the Plaintiffs, because their claims are *preempted by* ERISA. Rather, the prevailing practice is to grant a party whose state-law claims have been removed on the basis of complete preemption leave to file an

*I. Summary Judgment Standard*

The Court first will set forth the parties' relative burdens once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial[,]" quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 [6th Cir.1987] ). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

amended complaint, recasting those claims (which, despite their state-law language, *are* federal claims) in the language of ERISA. *See, e.g., Fallick v. Nationwide Mut. Ins. Co.,* 162 F.3d 410, 411 (6th Cir.1998) (following removal of state-court action on the basis of complete preemption of state common law claims, plaintiff filed amended complaint, asserting several causes of action directly under ERISA); *Whitt v. Sherman International Corp.,* 147 F.3d 1325, 1328 (11th Cir.1998) (following removal on the basis of complete preemption and dismissal of state-law claims, district court allowed plaintiff to file an amended complaint, setting forth a claim under ERISA); *Shea v. Esensten,* 107 F.3d 625, 627 (8th Cir.1997) (after removal of her state-court wrongful death action on the basis of complete preemption, plaintiff filed an amended complaint, converting the claim into one for breach of fiduciary duty under ERISA); *Degnan v. Publicker Industries, Inc.,* 83 F.3d 27, 30 (1st Cir.1996) (concluding that dismissal of preempted state-law claims is appropriate following removal, but also recognizing that parties may seek leave to file an amended complaint, framing preempted claims in terms of ERISA).

the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in 'favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also, L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."), *cert. denied*,

506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, upon only those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## II. *Analysis* [4]

In their Motions for Summary Judgment, Provident and Guardian contend that the Plaintiffs' state law claims are preempted by ERISA. In response, B–T and Matthews argue that preemption does not apply, because the three plans at issue are not governed by ERISA. As a means of analysis, the Court first will address the applicability of ERISA to B–T's claims under its Provident "Business Buy–Out" policy. The Court then will address ERISA's applicability to Matthews' claims under his Provident and Guardian disability insurance policies.

### A. *Provident "Business Buy–Out" Policy Issued to B–T*

In its Motion for Summary Judgment, Provident contends that B–T purchased its "Business Buy–Out" policy "to provide Matthews with additional disability benefits if he became disabled." [5] (Doc. # 27 at 3). Consequently, Provident argues that the policy constitutes a part of B–T's employee welfare benefit plan, and therefore, that B–T's various state law claims are preempted by ERISA.

Upon review, however, the Court concludes that the record does not support Provident's characterization of the "Buy–Out" policy. A reading of the policy reveals that it was intended to enable B–T to

---

4. For purposes of ruling on the Defendants' Motions for Summary Judgment, the following analysis will construe the facts, and all reasonable inferences drawn therefrom, in a light most favorable to the Plaintiffs, the non-movants.

5. After describing the "Business Buy–Out" policy as insurance intended to provide additional disability benefits to Matthews, Provident's Motion for Summary scarcely mentions the policy again, focusing instead upon the disability policy that it issued directly to Matthews.

recover the cost of redeeming Matthews' stock if he became totally disabled. The policy identified B–T as both the "loss payee" (i.e., beneficiary) and the policy owner. (Matthews depo., at Exh. 28). It promised the payment of benefits to B–T for a "Business Buy–Out Expense" if Matthews was an owner of the company and was engaged in active full-time work when his disability started, *and* if B–T became obligated to make payments to Matthews under the terms of his "Buy–Sell" agreement with the company. (*Id.* at 6). The policy defined a "Business Buy–Out Expense" as "any money paid by or through [B–T] to [Matthews] in the performance of the terms of the Buy–Sell agreement because of Total Disability of [Matthews]." (*Id.* at 4). The policy further defined a "Buy–Sell" agreement as a written agreement between B–T or its principals and Matthews, providing for the purchase of his ownership interest in the company due to his total disability. (*Id.*).

In his deposition testimony, Matthews explained that his "Buy–Sell" agreement with B–T was memorialized in a written February 28, 1989, agreement among all of the company's shareholders. It detailed the terms under which the company would repurchase their stock, and it required the shareholders to sell back their stock upon leaving the company. (Matthews depo. at 16, citing Buy–Sell Agreement, attached to Complaint, Doc. # 1, at Exh. A).[6] Matthews also explained that the "Business Buy–Out" policy was "key man" insurance, designed to "help with the stock repur-

chase if the stock had to be redeemed by the corporation." (Matthews depo. at 50–53). Finally, Matthews testified that any benefits paid to B–T under the policy were not "passed through" to the exiting shareholder.[7] (*Id.* at 80). Rather, the policy merely enabled the company to defray the expense associated with redeeming a shareholder's stock. (*Id.* at 80). This testimony is consistent with the deposition testimony of B–T vice president Everett Telljohann, who explained that the Provident policy guaranteed "that we would have funds in the corporation to eventually acquire Mr. Matthews' shares or to supplement our losses in the event he were disabled." (Telljohann depo. at 43).

Following Matthews' resignation from B–T, the company began redeeming his stock, making an initial payment of $300,000. (Bryson depo. at 29). B–T subsequently filed a claim with Provident under its Business Buy–Out policy, seeking to recover the cost of the stock redemption. Provident denied the claim, however, contending that Matthews did not terminate his relationship with the company due to a disability. Provident now seeks summary judgment on B–T's state law contract-related claims, arguing that such claims are preempted by ERISA.

■ After reviewing the Business Buy–Out policy, the Court rejects Provident's argument that the policy is part of an employee welfare benefit plan which is governed by ERISA.[8] Even assuming,

---

6. Matthews authenticated the Buy–Sell agreement during his March 17, 1999, deposition. (Matthews depo. at 16; *see also* Bryson depo. at 31 (identifying Exhibit A to the Plaintiffs' Complaint as the "buyout agreement").

7. Nothing in the Buy–Sell agreement required B–T to obtain "Business Buy–Out" insurance or to finance a stock redemption specifically with benefits payable under such a policy. Furthermore, the company's shareholders entered into the Buy–Sell agreement on February 28, 1989, and the Provident "Business Buy–Out" insurance policy did not become effective until April 1, 1994. (Bryson depo. at 28).

8. ERISA defines an "employee welfare benefit plan" as "any plan, fund, or program which was heretofore or is hereinafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B)

arguendo, that B–T maintains an ERISA plan for its employees, the Business Buy-Out policy plainly falls outside the scope of any such plan. Although not directly on point, the Court draws support for this conclusion from *Michigan Affiliated Healthcare System, Inc. v. CC Systems Corp. of Michigan*, 139 F.3d 546 (6th Cir. 1998). In that case, plaintiff Lansing General Hospital sponsored a major medical plan for its employees. Lansing General contracted with defendant CC Systems, which provided services as a third-party administrator for the plan. *Id.* at 548. Under the plan, Lansing General was required to pay the first $60,000 of an employee's covered medical expenses. Defendant Stop Loss International Corporation ("SLI") agreed to provide stop-loss insurance for any covered medical expenses which exceeded $60,000. *Id.* In 1992, Lansing General approved and paid a claim by one of its employees for cancer treatments. After paying for the treatments, Lansing General submitted a claim to SLI, which denied payment under the stop-loss policy. Lansing General then filed suit against CC Systems and SLI in state court, alleging breach of contract and seeking reimbursement for the expenses it incurred in connection with the employee's cancer treatments. *Id.* Upon review, the Sixth Circuit determined that Lansing General's suit was not preempted by ERISA, because the hospital was proceeding on its own breach of contract claim, and not on behalf of the employee. *Id.* at 550.

Similarly, in the present case, B–T is not proceeding on behalf of Matthews. Rather, the company is seeking to recover, on its own behalf, under the terms of the Business Buy–Out policy that it purchased from Provident. Consequently, the Court concludes that B–T's "Buy–Out" policy is not part of an ERISA-governed employee welfare benefit plan. *Cf. Geweke Ford v. St. Joseph's Omni Preferred Care, Inc.*, 130 F.3d 1355, 1358 (9th Cir.1997) ("ERISA does not preempt regulation of those relationships 'where a plan operates just like any other commercial entity—for instance the relationship between ... the plan and its insurers or creditors.'"); *Strategic Outsourcing v. Commerce Benefits Group Agency, Inc.*, 54 F.Supp.2d 566, 573 (W.D.N.C.1999) ("Reinsurance coverage does not provide insurance benefits for the plan participants but instead is in the nature of excess liability coverage for the employer and, as such, falls outside the scope of both the plan and ERISA."); *Stamm v. Provident Life and Accident Ins. Co.*, 1998 WL 596700 (N.D.Ill. Sept.2, 1998) (holding that a "key man" disability insurance policy, which is owned by an employer and which pays benefits to the employer in the event of an employee's disability, "is not an ERISA plan and cannot be considered part of an ERISA plan"); *Union Health Care, Inc. v. John Alden Life Ins. Co.*, 908 F.Supp. 429, 433 (S.D.Miss.1995) (concluding that a suit between an employer plan sponsor and its insurer "is simply a contract dispute" and is not preempted by ERISA); *Fox, Curtis & Associates, Inc. v. Employee Benefit Plans, Inc.*, 1993 WL 265474 (N.D.Ill. July 13, 1993) (recognizing that ERISA does not preempt a breach of contract claim brought by an employer against its loss reinsurer). In light of the foregoing authorities, the Court concludes that B–T's state law claims are not preempted by ERISA. Accordingly, Provident's Motion for Summary Judgment (Doc. # 27) will be overruled, insofar as it relates to the company's "Buy–Out" policy.[9]

---

any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions)." 29 U.S.C. § 1002(1).

**9.** In opposition to this conclusion, Provident reasons that B–T's benefits under the Business Buy–Out policy "inure to Matthews," because the company "merely acts as a conduit for the payment of policy proceeds to Matthews." (Doc. # 33 at 19–20). Thus, Provident argues that the policy is part of an employee welfare benefit plan. The record does not support Provident's assertion. B–T was obligated to redeem Matthews' stock, and

**B.** *Provident and Guardian Disability Insurance Policies Issued to Matthews*

 Although the Court has determined that B–T's state law claims are not preempted by ERISA, the Court must engage in a separate analysis to determine whether Matthews' individual Provident and Guardian policies are part of an employee welfare benefit plan which is governed by ERISA. If those policies are not governed by ERISA, then his state-law claims against Provident and Guardian cannot be preempted by the statute. Title 1 of ERISA defines an "employee welfare benefit plan," *inter alia,* as any plan, fund, or program established by an employer to provide disability benefits, through the purchase of insurance or otherwise, to participants or their beneficiaries. 29 U.S.C. § 1002(1). "The existence of an ERISA plan is a question of fact, to be answered in light of all the surrounding circumstances and facts from the point of view of a reasonable person." *Thompson v. American Home Assurance Co.,* 95 F.3d 429, 434 (6th Cir.1996); *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 976 (5th Cir.1991) ("Whether a particular set of insurance arrangements constitute[s] an 'employee welfare benefit plan' is a question of fact."). When determining whether a welfare benefit plan is an ERISA-governed plan, a court ordinarily must undertake a three-step factual inquiry. *Thompson,* 95 F.3d at 434. *First,* it must apply certain "safe-harbor" regulations established by the Department of Labor to determine whether the plan is exempt from ERISA's reach. Under those regulations, a plan is exempt from ERISA regulation if: (1) the employer makes no contribution to the policy; (2) employee participation in the policy is completely voluntary; (3) the employer's sole functions are, without endorsing the policy, to permit the insurer to publicize the policy to employees, collect premiums through payroll deductions and remit them to the insurer; and (4) the employer receives no consideration in connection with the policy other than reasonable compensation for administrative services actually rendered in connection with payroll deduction. 29 C.F.R. § 2510.3–1(j). *Second,* a court must determine whether a "plan" exists. In so doing, it must inquire "whether 'from the surrounding circumstances a reasonable person [could] ascertain the intended benefits, the class of beneficiaries, the source of financing, and procedures for receiving benefits.'" *Thompson,* 95 F.3d at 435. *Third,* a "court must ask whether the employer 'established or maintained' the plan with the intent of providing benefits to its employees." *Id.*

With the foregoing requirements in mind, the Court turns now to an analysis of the Provident and Guardian disability insurance policies owned by Matthews. Before engaging in the three-part analysis set forth by the Sixth Circuit in *Thompson,* however, the Court must resolve a threshold issue which was not raised in that case. In his Memorandum opposing summary judgment, Matthews argues that he qualifies as an "employer" under ERISA, not as an "employee." In support, he contends that he served as an "employer-shareholder-director-officer" while working for B–T. In light of his status as a shareholder/director, Matthews then relies upon *Harker v. Provident Life and Accident Ins. Co.,* No. C–3–97–68 (S.D.Ohio Sept. 16, 1998) (Dlott, J.), and Department of Labor regulations cited therein, for the proposition that ERISA does not apply to his claims against the Defendants.

In *Harker,* the plaintiff was one of six anesthesiologists who together owned all

it did so, without respect to the existence of Buy–Out insurance. As set forth, *supra,* that insurance only protected B–T against the significant expense that it would incur when redeeming an individual's stock. Thus, the

Buy–Sell agreement itself may have inured to Matthews' benefit, but the Buy–Out insurance inured solely to the benefit of B–T, the policy owner and the beneficiary.

of the shares of a closely held corporation, Forest Grand Anesthesiologists, Inc. The plaintiff also served as an officer of the corporation and, along with the other shareholders, he sat on its board of directors. *Id.* at 2. In 1978, the corporation purchased Provident disability insurance policies for the plaintiff and the other shareholders. *Id.* After being diagnosed with acoustic neuroma, a condition which affects hearing ability, the plaintiff filed a claim for disability benefits under his Provident policy. The insurance company initially approved the claim, but later discontinued making payments to the plaintiff. *Id.* at 3. As a result, he filed suit in state court, asserting several contract-based claims. Provident subsequently removed the action on the basis of diversity jurisdiction. *Id.* The insurance company then filed a motion for summary judgment, alleging that the plaintiff's claims were preempted by ERISA. Upon review, the District Court disagreed, holding that the disability insurance policy did not constitute an "employee welfare benefit plan" under ERISA.

In reaching its conclusion, the *Harker* court reasoned that the plaintiff and the other shareholders were "employers," not "employees." Given the absence of any covered "employees," the court then concluded that no "employee welfare benefit plan" existed. In support, the *Harker* court relied largely upon two Department of Labor regulations. The court first cited 29 C.F.R. § 2510.3–3(b), which provides, in relevant part:

> (b) *Plans without employees.* For purposes of Title I of [ERISA] and this chapter, the term "employee benefit plan" shall not include any plan, fund or program ... under which no employees are participants covered under the plan.... For example, a so-called "Keogh" or "H.R. 10" plan under which

only partners or only a sole proprietor are participants covered under the plan will not be covered under Title I.

The *Harker* court also quoted 29 C.F.R. § 2510.3–3(c)(1), which applies to businesses owned by an individual alone or in conjunction with his or her spouse, and provides:

> (1) An individual and his or her spouse shall not be deemed to be employees with respect to a trade or business, whether incorporated or unincorporated, which is wholly owned by the individual or by the individual and his or her spouse[.]

Although the *Harker* court recognized that the foregoing regulations "arguably [did] not address the exact situation presented," it relied upon them, and several cases involving sole proprietors, sole shareholders, or family businesses [10] to find that the plaintiff was an "employer," rather than an "employee." In support, the court reasoned:

> ... Dr. Harker sits on the board of Forest Grand and is involved in all board decision[s], including the purchase of disability insurance policies. Although the entity of Forest Grand purchased the policies, this was done at the direction and for the benefit of Dr. Harker and the other anesthesiologist-owners. The only beneficiaries of these policies were the owners; no non-owner employees of Forest Grand were covered. ERISA was not intended to reach a plan such as Forest Grand's whose only beneficiaries are a small number of owner-employers. It makes little sense to apply ERISA to such a plan, for it is illogical that Dr. Harker as employee needs protection from Dr. Harker, as employer....

*Harker*, at 8–9.

In his Memorandum opposing summary judgment, Matthews urges the Court to

---

**10.** *See Fugarino v. Hartford Life and Accident Ins. Co.,* 969 F.2d 178, 186 (6th Cir.1992); *Matinchek v. John Alden Life Ins. Co.,* 93 F.3d 96, 101 (3rd Cir.1996); *Madonia v. Blue Cross and Blue Shield,* 11 F.3d 444, 448 (4th Cir. 1993); *Kennedy v. Allied Mutual Ins. Co.,* 952 F.2d 262, 264 (9th Cir.1991); *Meredith v. Time Ins. Co.,* 980 F.2d 352, 358 (5th Cir. 1993).

follow *Harker*, and to find that his disability insurance policies are "plans without employees." Upon review, however, the Court respectfully disagrees with the reasoning set forth in *Harker*. The first Department of Labor regulation quoted above provides little guidance with respect to Matthews' status as an employer or an employee. It instructs that a plan without "employees" is not an ERISA plan. 29 C.F.R. § 2510.3–3(b). The regulation then explains that sole proprietors and partners are not "employees" for purposes of ERISA. Matthews, however, is neither a sole proprietor nor a partner. The second regulation is equally inapplicable to the present circumstances. It provides that an individual and his or her spouse do not qualify as "employees," if they operate a wholly owned business. 29 C.F.R. § 2510.3–3(c)(1). Matthews, however, does not operate a business which he owns alone or in conjunction with a spouse. Likewise, as noted above, the cases cited by *Harker*, and relied upon by Matthews, all involve sole proprietors, sole shareholders, partners, and wholly owned family businesses.[11]

In the present case, however, Matthews was a minority shareholder in a corporation for which he worked. Notably, none of the legal authority cited by *Harker* addresses a similar situation. Matthews worked for B–T pursuant to a written employment agreement, which covered the terms of his employment relationship with the company. (Complaint, Doc. #1 at Exh. B).[12] Among other things, it addressed issues such as compensation, duties, benefits, bonuses, non-compete covenants, non-disclosure of proprietary information, and termination. (*Id.*). The company paid Matthews a salary, and he received W–2 forms for income tax purposes. Although Matthews owned approximately twenty percent of the company's stock and held an executive-level position, he maintained an identity separate and apart from his corporate employer. Unlike a sole shareholder or sole proprietor, Matthews could not make unilateral decisions regarding employee welfare benefits. Thus, the Court finds the present case distinguishable from those upon which Matthews relies. While a sole proprietor, a sole shareholder, or a partner may not need the protection of ERISA, the same cannot necessarily be said about a minority shareholder of a corporation. In any event, the Court finds nothing in ERISA itself, or the Department of Labor regulations, which precludes an individual such as Matthews from qualifying as an "employee" under the statute.[13]

This conclusion is consistent with the reasoning set forth in a recent Seventh Circuit decision, *In the Matter of Baker*, 114 F.3d 636 (7th Cir.1997). In that case, the court rejected an argument that a *majority* shareholder in a corporation qualifies as an "employer" under ERISA.

---

**11.** In one of those cases, *Fugarino v. Hartford Life and Acc. Ins. Co.*, 969 F.2d 178, 185 (6th Cir.1992), the Sixth Circuit did state that "[a]s a result of these regulations [i.e., 29 C.F.R. § 2510.3–3(b) and (c)(1)], a plan whose sole beneficiaries are the company's owners cannot qualify as a plan under ERISA." *Fugarino* is distinguishable, however, because it involved a sole proprietor of a restaurant. *Id.* at 181. In that case, the restaurant owner was not an "employee" under ERISA, because case law and Department of Labor Regulations expressly exclude sole proprietors and sole shareholders from holding "employee" status. *Id.* at 186. In *S.E.C. v. Johnston*, 143 F.3d 260, 262 (6th Cir.1998), the Sixth Circuit again noted that "[a] plan whose sole beneficiaries are the company's owners cannot qualify as a plan under ERISA." Notably, however, that case involved the sole owner of a corporation. In its analysis, the Sixth Circuit cited *Fugarino* and the Department of Labor regulations discussed, *supra*. None of the analysis in either case supports the broad proposition that a minority shareholder in a non-family business cannot be an "employee" under ERISA.

**12.** Matthews authenticated the employment agreement in his deposition testimony. (Matthews depo. at 6).

**13.** ERISA defines an "employee" in circular fashion as "any individual employed by an employer." 29 U.S.C. § 1002(6).

*Id.* at 639. In so doing, the court recognized that a sole proprietor qualifies as an "employer" rather than an "employee." *Id.* The court noted, however, that a shareholder and a corporation are separate legal entities, whereas a sole proprietor and his business are one in the same. *Id.* The *Baker* court also recognized that "[m]any closely held corporations insist that employees own stock (as do a few large corporations, such as United Air Lines); this does not prevent ERISA from regulating their pension plans."[14] *Id.* Finally, the court addressed 29 C.F.R. § 2510.3-3(c)(1), reasoning:

> Although the Department of Labor has issued a regulation stating that a corporation's sole owner is not an "employee" for the purpose of activating Subchapter I of ERISA, *see* 29 C.F.R. § 2510.3-3(c)(1), Baker was not Bakco's sole equity investor; he owned 50.9 percent of its stock. What is more, several courts of appeal have held, properly in our view, that this regulation means only that a one-person corporation must use a Keogh plan rather than an ERISA plan for its solitary employee. . . .

*Id.* at 639.

▉▉ The Seventh Circuit's ruling is consistent with ERISA, the Department of Labor regulations, and the Court's reasoning herein. Based upon that reasoning, the Court concludes that Matthews qualifies as an "employee" under Title I of ERISA, and that he was employed by B–T, his "employer."[15] Having reached that conclusion, the Court turns now to its analysis of the Provident and Guardian disability insurance policies owned by Matthews, and the three-part inquiry set forth by the Sixth Circuit in *Thompson,* 95 F.3d at 429. As noted, *supra,* the Court must determine: (1) whether the Department of Labor "safe harbor" provisions apply: (2) whether a "plan" exists; and (3) whether B–T "established or maintained" the plan for the purpose of providing employee welfare benefits.[16] The Court will address these issues seriatim.

*1. Applicability of the "Safe–Harbor" Provisions*

With respect to both policies, the Court finds a genuine issue of material fact regarding the applicability of the Department of Labor's "safe harbor" regulations. Those regulations exclude a benefit plan from ERISA's reach if: (1) the employer makes no contribution to the policy; (2) employee participation in the policy is completely voluntary; (3) the employer's sole functions are, without endorsing the

**14.** Although *Baker* involved a pension plan rather than a welfare benefit plan, the statutory provisions and regulations defining an "employee" are the same.

**15.** The Court's conclusion that Matthews qualifies as an "employee" under ERISA also resolves his related argument that he lacks standing to enforce any rights under the statute. In his Memorandum opposing summary judgment, Matthews asserts that, as an "employer," he cannot bring a claim under § 1132(a)(1)(b), ERISA's civil enforcement provision, because he cannot qualify as a plan "participant" or "beneficiary." Therefore, he argues that he retains his right to seek redress under state law. (Doc.# 31 at 13–14). In light of the Court's determination that Matthews is an "employee" under ERISA, however, he *does* qualify as a potential plan "participant" or "beneficiary," and his standing argument is meritless.

**16.** Matthews' Provident and Guardian disability insurance policies were individual policies, not group policies. As Guardian properly notes, however, this fact does not detract from the potential existence of an ERISA plan. In *Massachusetts Casualty Ins. Co. v. Reynolds,* 113 F.3d 1450, (6th Cir.1997), the court recognized that the purchase of five or six individual disability insurance policies, with a "common employer rider" and a corresponding premium discount, may qualify as an employee benefit plan governed by ERISA. *Id.* at 1452, 1453. In the present case, the record reflects that several top B–T shareholder-employees, including Matthews, purchased policies from the Defendants at or about the same time. B–T submitted payments for the policy premiums under a "batch billing" procedure and received a ten-percent discount. The Court finds these circumstances roughly analogous to the circumstances in *Massachusetts Casualty.*

policy, to permit the insurer to publicize the policy to employees, to collect premiums through payroll deductions, and remit them to the insurer; and (4) the employer receives no consideration in connection with the policy other than reasonable compensation for administrative services actually rendered in connection with payroll deductions.[17] 29 C.F.R. § 2510.3–1(j). A policy falls outside the scope of ERISA only if *all* of the foregoing requirements are met.

In their Motions for Summary Judgment, Provident and Guardian both argue that B–T paid the premiums for Matthews' disability insurance policies. As a result, they argue that he cannot establish the first safe-harbor requirement, as a matter of law. The record contains some evidence supporting the Defendants' contention that B–T paid Matthews' premiums. On his application for both policies, Matthews indicated that his employer would pay all of the premiums, and that the cost would not be included as income on his W–2 forms. Additionally, Guardian has provided the Court with an affidavit from CPA Roger Logan, the owner of a Cincinnati-based management consulting firm. (Doc. # 28 at Exh. B). Logan avers that he has reviewed documentation provided by Matthews and B–T. Based upon that documentation, Logan expresses his opinion that B–T "paid the reported disability and insurance premiums for the employees' benefit on the Provident and Guardian policies," and that "[t]hese amounts were not reported or paid by Matthews." (*Id.* at ¶ 9). On the other hand, Matthews explained in his deposition testimony that his insurance agent filled out the application for his Guardian policy. (Matthews depo. at 20). Matthews does not believe that he told the agent B–T would pay the premiums, or

that none of the premium payment would be included as taxable income on his W–2 forms. (*Id.* at 21). Matthews also testified that B–T paid the premiums for his Provident and Guardian policies, and that the premium expense subsequently was included on his W–2 forms as taxable income. (*Id.* at 63–65, 84). Likewise, B–T president James Bryson and vice-president Everett Telljohann both testified that the company paid all disability insurance premiums, but that the premiums were included at taxable income on Matthews' W–2 forms. (Bryson depo. at 20, 24; Telljohann depo. at 25–26, 30–31). Finally, the record contains some documentation supporting Matthews' claim that the premium payments were treated as part of his income. In a 1996 letter to his tax preparer, Matthews stated that he had paid the premiums on his Guardian policy. (*Id.* at 63, quoting Exh. 22). The record also contains a document which Telljohann identified as a list of B–T premium expenses that were to be given to Matthews' accountant for inclusion in his gross income. (Telljohann depo. at 31, citing Matthews depo. Exh. 25). Finally, Matthews has provided the Court with an affidavit in which he asserts that his W–2 gross income for the years in question exceeded his salary and bonuses, because B–T included insurance policy premiums in the gross income figure. (Matthews affidavit, attached to Doc. # 31).

■ In light of the foregoing evidence, the Court cannot conclude, as a matter of law, that B–T truly "paid" the premiums for Matthews' Provident and Guardian disability insurance policies. Construing the evidence in a light most favorable to Matthews, a trier of fact reasonably could find that B–T made the actual premium payments to Provident and Guardian (i.e., wrote the checks), but then included the

---

**17.** Neither Provident nor Guardian disputes that participation by Matthews was voluntary. Consequently, the Court need not address the second requirement of the safe-harbor regulations. Furthermore, only Guardian contends that B–T "received consideration" in connection with its disability insurance policy issued to Matthews. As a result, the Court will address the fourth safe-harbor requirement only as it relates to Matthews' Guardian insurance policy.

expense as gross income on Matthews' W–2 forms. If the company did so, then it essentially procured coverage through a payroll deduction.[18] Although the Court has located little case law addressing this precise issue, at least two other District Courts have agreed that an employer's payment of insurance premiums, with the cost charged to the covered employee as taxable income, "falls squarely within the 'safe harbor' provision of 29 C.F.R. § 2510.3–1(j)." *See Schneider v. Provident Life & Accident Ins. Co.*, 1999 WL 281206 (N.D.Cal. May 4, 1999); *St. Martin v. Provident Life & Accident Ins. Co.*, 1993 WL 262708 (E.D.La. July 2, 1993) ("Guardian also contends that because St. Martin indicated in his application for the disability policy that the firm would pay 100 percent of the policy's premiums, the disability policy is part of the firm's ERISA plan. Guardian has not only failed to provide any authority for this proposition, but it has also overlooked evidence showing that contrary to St. Martin's application, the firm in fact did not pay 100 percent of the premiums. The premiums were taxed as income to St. Martin in 1990 and 1991. . . . Consequently, St. Martin's disability policy is not part of the firm's ERISA plan."); *see also Morris v. Paul Revere Ins. Group*, 986 F.Supp. 872, 879 (D.N.J.1997) (recognizing that "ERISA's Safe Harbor Provision may cover situations where an employer pays insurance premiums and deducts their value from an employee's salary").[19]

18. It is well settled that the an employer's "payment" of insurance premiums through payroll deductions is permissible under the D.O.L. safe-harbor provisions. *Thompson v. American Home Assurance Co.*, 95 F.3d 429, 435 (6th Cir.1996).

19. In opposition to this conclusion, Guardian insists that B–T "paid" Matthews' premiums, thereby precluding application of the safe-harbor provisions, *even if* he reimbursed the company for its payments, *or if* the premium payments were treated as income to Matthews. In support, Guardian cites *Fugarino*, 969 F.2d at 183–184. A close reading of *Fugarino* reveals, however, that it supports only the former proposition advanced by Guardian. In *Fugarino*, the employer paid the premiums and allowed the employee to reimburse it for the expense. The Sixth Circuit noted that this level of employer involvement, along with other factors, precluded application of the safe-harbor provisions. Notably, *Fugarino* did not involve an employer who paid policy premiums and treated those payments as taxable income to the employee. In the Court's view, such a situation is analogous to the employer making the premium payments via a payroll deduction, a procedure which the safe-harbor provisions expressly allow. *Thompson*, 95 F.3d at 435.

Finally, in its Reply Memorandum, Guardian posits several additional arguments why the safe-harbor provision should not apply, even if Matthews included the policy premiums as income on his W–2 forms. In particular, the insurance company argues that "[e]ven if one assumes, for purposes of argument, that the amount of the Guardian premiums was included in his W–2 and treated as income by Matthews, he did not reimburse [B–T] for the premiums it paid, and he did not have the same 'out-of-pocket' expense he would have had if he had paid the premiums directly to Guardian himself. In the first place, had he purchased the policy on his own, he would not have received the 10% batch billing discount on his premiums and if [B–T] had given him the additional income to pay his premium, he would have been required to pay taxes on the income and to pay the full amount of the premium to Guardian." The Court finds these arguments unpersuasive. Matthews quite reasonably did not "reimburse" B–T for the premium payments it made to Provident and Guardian. Indeed, it would have been illogical for him to "reimburse" B–T for the premiums, if those payments were included in his gross income. Likewise, the fact that Guardian obtained a better rate for Matthews does not suggest that it contributed to the premium payments. Furthermore, the Court fails to comprehend B–T's argument that Matthews "would have been required" to pay both the policy premiums, and the taxes on the income he used to pay those premiums, if Guardian had given him "additional income" to make the payments. According to Matthews, that is precisely what happened in the present case. He alleges that the premium amounts were treated by B–T as gross income to him. As a result, he *did* pay the premiums, and he *was* required to pay taxes on the premium amount. Guardian also argues, however, that "[b]y having [B–T] pay the premium out of its 'before tax dollars,' all

In their Motions for Summary Judgment, Provident and Guardian also both argue that B–T "endorsed" Matthews' disability insurance policies and actively participated in obtaining them. As a result, they argue that he cannot establish the third safe-harbor requirement. In *Thompson*, the Sixth Circuit identified the circumstances under which an employer will be found to have "endorsed" an employee welfare benefit plan, thereby removing it from the scope of the safe-harbor provision:

> ... [T]he court determines that a finding of endorsement is appropriate if, upon examining all the relevant circumstances, there is some factual showing on the record of substantial employer involvement in the creation or administration of the plan. *See Hansen*, 940 F.2d at 977 (requiring "some meaningful degree of participation by the employer in the creation or administration of the plan"). For example, where the employer plays an active role in either determining which employees will be eligible for coverage or in negotiating the terms of the policy or the benefits provided thereunder, the extent of employer involvement is inconsistent with "employer neutrality" and a finding of endorsement may be appropriate. *See, e.g., Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 417 (4th Cir.1993) (considering, *inter alia*, employer's role in negotiating terms and benefits of the policy in determining whether a plan should fall out of

the safe harbor); *Wickman*, 908 F.2d at 1083 (considering, *inter alia*, employer's role in devising eligibility requirements when determining the applicability of the safe harbor regulations). Similarly, where the employer is named as the plan administrator, a finding of endorsement may be appropriate. *See, e.g., Kanne*, 867 F.2d at 493; *Shiffler v. Equitable Life Assur. Soc. of U.S.*, 838 F.2d 78, 82 n. 4 (3d Cir.1988) (both considering, *inter alia*, the employer's role in administering the plan when determining whether to allow the policy to come under the safe harbor provision of the DOL regulation).

*Thompson*, 95 F.3d at 436.

■ In the present case, the Court finds a genuine issue of material fact as to whether B–T "endorsed" Matthews' insurance. As noted above, the hallmark of endorsement is a lack of employer neutrality with respect to the insurance plan or policy. *Id.* at 436. Neutrality may be absent when an employer serves as a plan administrator or plays an active role in the creation or administration of a plan. *Id.* On the other hand, when an employer makes clear that an insurance program is a third-party's offering, not subject to the employer's control, then the safe-harbor may be available. *Id.*

In its Motion for Summary Judgment, Provident argues that B–T "purchased" Matthews' Provident disability policy for the purpose of funding the company's executive "salary continuation plan." (Doc.

Matthews had to pay out of pocket was the income tax on the amount of the premium. This also permitted [B–T] to deduct the amount of its payments as an expense to reduce its profits." (Doc. # 32 at 6). Once again, Guardian's argument is misplaced. If the premium payments were treated as gross income to Matthews, the inescapable conclusion is that the payments were made out of *his* taxable income, essentially in the form of a payroll deduction. He then allegedly also paid income tax on the premium amounts, because they were listed as gross income on his W–2 forms. As noted, *supra*, such a practice does not run afoul of the safe-harbor provision of 29 C.F.R. § 2510.3–1(j). Finally,

Guardian argues that "[h]ad Matthews received the amount of the premiums as income and paid the premium himself, he would not have been able to deduct the payment from his income." (*Id.*). Matthews' contention, however, is that he *did* receive the amount of the premiums as income, as evidenced by his W–2 forms, and therefore, that he *did* pay the premiums himself, notwithstanding the fact that his employer sent his payments to the insurance companies. The Court fails to comprehend Guardian's argument regarding Matthews "deducting" those payments from his income, and the insurance company provides no elaboration on the issue.

# 27 at 2–3, 9). Provident also contends that B–T sought and obtained an increase in insurance benefits under the plan. (*Id.* at 9–10). Finally, Provident stresses that Matthews applied for additional coverage under his policy with the insurance company, and identified his coverage as "Employer sick pay disability income coverage." (*Id.* at 11). In light of the foregoing facts, Provident insists that its policy "became an integral part of [B–T's] employee benefits[,] and [B–T] did not remain neutral as to this policy but held it out as an employee benefit." (*Id.* at 11). In its Motion for Summary Judgment, Guardian addresses the "endorsement" issue in two sentences, without any citation to the record, stating: "The third [safe-harbor] condition is not met because Matthews' policy was 'endorsed' by his employer and was used to fund [B–T's] salary continuation plan. Further, the employer was involved in selecting coverage, establishing compensation and benefit plans and in paying premiums." (Doc. # 28 at 12).

Construing the evidence and all reasonable inferences in a light most favorable to the Plaintiffs, however, the Court cannot conclude, as a matter of law, that B–T "endorsed" Matthews' Provident and Guardian insurance plans. As noted above, both Provident and Guardian base their "endorsement" arguments in part upon B–T's "purchase" of Matthews' insurance and payment of his policy premiums. In its analysis, *supra*, however, the Court has found a genuine issue of material fact regarding whether B–T or Matthews actually "paid" the premiums or purchased the insurance.

Both Defendants also support their "endorsement" claim by arguing that B–T obtained the insurance in order to fund a "salary continuation plan." In his deposition, B–T president James Bryson admitted that the company maintained a "salary continuation plan." (Bryson depo. at 11). He also explained, however, that he and Matthews were *excluded* from participating in the plan, because they held more than five percent of the company's stock. (*Id.* at 11, 13). Consequently, disability insurance policies were purchased by Matthews and Bryson as a means to provide them with their own "salary continuation," albeit apparently outside of any official salary continuation plan.[20] (*Id.* at 14–15). As noted above, however, the Court cannot determine who actually purchased these policies or paid the policy premiums.[21] Furthermore, construed most strongly in the Plaintiffs' favor, the record suggests that both Bryson and Matthews made a personal choice to purchase, and to increase, their disability insurance coverage, at least in part because of their inability to obtain benefits under a company plan. In his deposition, Matthews testified that the disability insurance policies were purchased, "but they were never treated as benefits of [his] position." (Matthews depo. at 11–12). Matthews also stated that, at one point, B–T did "put in place a formal disability income plan[.]" (*Id.* at 38). He added, however, that the plan

---

**20.** The only record evidence of a "salary continuation" agreement involving Matthews is his January 25, 1995, Resignation Agreement. (Matthews depo. at Exh. 21). In that agreement, Matthews and B–T referred to his severance pay as a "Salary Continuation Payment."(*Id.* at 4). In its Motion for Summary Judgment, Guardian argues that Matthews' disability insurance was purchased to fund this "salary continuation" obligation. (Doc. # 28 at 6). Curiously, however, Matthews had purchased the Provident and Guardian polices *years before* the Resignation Agreement created B–T's "salary continuation" obligation. Furthermore, nothing in the Resignation Agreement indicates that Matthews'

severance pay was to be "funded" with his own disability insurance policies. Rather, the agreement simply reduced B–T's severance pay obligation to the extent that Matthews received insurance proceeds under his policies. In other words, B–T was required to provide Matthews with severance pay, unless he collected the same amount under his policies. The agreement *does not* state that B–T would fund its severance pay obligation with Matthews' insurance policies.

**21.** The policies identify Matthews as the owner and beneficiary.

"didn't pertain to the policies that Jim [Bryson] and I took out." (*Id.* at 39). In addition, Matthews stated that he personally maintained responsibility for his own policies. (*Id.* at 69). Similarly, Bryson testified that he and Matthews "provided [their] own insurance," which was not treated as a company benefit, given their status as major stockholders. (Bryson depo. at 65).[22] Bryson also discussed his inquiry about obtaining increased disability insurance coverage for himself and Matthews. (*Id.* at 16). He stated that he made the inquiry after having a conversation with Matthews about their need for more coverage. (*Id.*). Specifically, he testified that Matthews "probably said go ahead and do it. This wasn't something that I was off doing and on my own. This would be something that maybe Steve [Matthews] and I would talk about because of our, you know, concern." (*Id.*).[23] Finally, Bryson testified that the characterization of Matthews' Provident disability insurance as "Employer sick pay disability income coverage" was inaccurate. (*Id.* at 19). Although Matthews' insurance application identified the coverage as such, Bryson testified that the form was completed by an insurance agent, not by Matthews. (*Id.*).

Reviewing the foregoing deposition testimony and other evidence in a light most favorable to the Plaintiffs, the Court cannot say, as a matter of law, that B–T "endorsed" the Provident and Guardian plans at issue. As noted above, the Court cannot determine, on the present record, who paid for Matthews' insurance coverage. In addition, the Defendants cite no evidence suggesting that B–T served as a plan administrator with respect to Mat-

thews' policies. Nor do the Defendants argue that Matthews submitted his claims for disability benefits through B–T personnel. The Sixth Circuit has recognized each of these factors as being relevant to the issue of whether an employer "endorsed" an employee welfare benefit plan. *Thompson,* 95 F.3d at 436–437; *Arbor Health Care Co. v. Sutphen Corp.,* 181 F.3d 99, 1999 WL 282667 (6th Cir. April 30,1999). The Court also notes that B–T does not appear to have provided Matthews with a summary plan description or to have made any reference to ERISA governing his rights. *Cf. Thompson,* 95 F.3d at 437. Nor did B–T distribute enrollment forms or brochures, or recommend that Matthews purchase the policies at issue. Construed most strongly in Matthews' favor, the record suggests only that Matthews and Bryson decided to purchase disability insurance, that Bryson made inquiries about obtaining and/or increasing his and Matthews' coverage, that Bryson may have shared that information with other stockholders, and, finally, that B–T wrote the premium checks, with the cost treated as taxable income to Matthews and Bryson. Under these circumstances, a trier of fact reasonably could conclude that B–T did nothing more than perform "ministerial tasks" and "pass along" Matthews' premium payments to the Defendants, essentially in the form of a payroll deduction. As a result, the Court cannot find, as a matter of law, that B–T "endorsed" the policies at issue. *Cf. Thompson,* 95 F.3d at 436–437.

In a final argument, Guardian asserts that Matthews cannot establish the *fourth* safe-harbor requirement, insofar as it re-

---

**22.** Although Bryson made this particular statement in response to a question about health insurance coverage, his testimony suggests that he perceived himself and Matthews as being ineligible to receive any insurance plan coverage as a company benefit, given their status as major B–T shareholders. *See, e.g.,* Bryson depo. at 13 ("We were an S corporation, and both of us had more than five percent of the corporation. By law we're

excluded. Government is afraid we'll provide ourselves too many benefits.").

**23.** Bryson's testimony is consistent with Matthews' recollection of events. In his deposition, he explained that his decision to take out disability insurance was a "personal choice" which he made in consultation with Bryson. (Matthews depo. at 20).

lates to his disability insurance policy with that company. As noted, *supra*, the fourth requirement excludes a plan from ERISA's reach only if the employer receives no consideration (other than reasonable compensation for services rendered) in connection with the employee welfare benefit program. 29 C.F.R. § 2510.3–1(j). In the present case, Guardian contends, in a one-sentence argument, that B–T received consideration in connection with Matthews' policy, because he signed his first disability insurance check over to the company after receiving it. (Doc. #23 at 11). In light of the circumstances surrounding Matthews' actions, the Court finds Guardian's argument unpersuasive.

The record reflects that Matthews entered into a detailed resignation agreement with B–T, prior to his receipt of any disability payments from Guardian. (Matthews depo. at Exh. 21). As part of the agreement, the company promised to provide him with one month of severance pay for each year that he had worked for the company.[24] (*Id.* at 4). The agreement provided, however, that the company's severance pay obligation would be offset, dollar-for-dollar, by any disability insurance payments that Matthews might receive during the term of the severance pay agreement. (*Id.*). In his deposition, Matthews explained that B–T made severance payments to him, and then he received a disability insurance check from Guardian. Consequently, he signed the check over to

B–T "kind of like an offset." (Matthews depo. at 61, 88).

After reviewing Matthews' deposition testimony and the terms of the resignation agreement, the Court cannot agree that the company received "compensation" in connection with the Guardian disability insurance plan, within the meaning of the safe-harbor regulations. In its resignation agreement with Matthews, B–T agreed to provide him with severance pay, only to the extent that he did not receive disability insurance. Because Matthews *did* receive disability payments, albeit *after* receiving substantial severance pay from his former employer, he repaid B–T by signing his first disability insurance check over to the company. Under these circumstances, B–T did not receive "compensation" in connection with the Guardian plan. Rather, it merely recouped an overpayment that it had made to Matthews under the terms of the resignation agreement. Accordingly, the Court rejects Guardian's argument that Matthews cannot satisfy the fourth safe-harbor requirement, as a matter of law.[25]

Nevertheless, for the reasons set forth above, the Court finds a genuine issue of material fact regarding Matthews' ability to establish the first and third safe-harbor requirements, namely B–T's non-contribution to the policy premiums and its "non-endorsement" of the Provident and Guardian insurance policies. Consequently, the Court finds unpersuasive the Defendants'

24. The resignation agreement refers to the severance pay, alternatively, as a "Salary Continuation Payment." *Id.*

25. This conclusion also defeats Matthews' argument that ERISA should not apply because his payment to B–T violates the statute's "anti-inurement" provision, 29 U.S.C. § 1103(c), which provides that no "plan assets" shall inure to the benefit of an employer. (*See* Doc. #31 at 14). The anti-inurement provision is intended "to guard against 'such abuses as self-dealing, imprudent investing, and misappropriation of plan funds' by plan administrators and employers." *Engelhardt v. The Paul Revere Life Ins. Co.*, 139 F.3d 1346, 1352 (11th Cir.1998). The anti-inure-

ment provision "appears intended to restrict the use of assets accumulating in trust and pension funds." *Prudential Ins. Co. of America v. Doe*, 76 F.3d 206, 209 (8th Cir.1996). Matthews' act of signing his disability check over to B–T implicates none of the foregoing concerns and, in any event, the company did not receive "plan assets." Assuming, purely arguendo, that the insurance proceeds were "plan assets," they were received by Matthews. He then used those proceeds to repay his debt to B–T. Thus, B–T received Matthews' assets, not "plan assets," and his decision to repay the company with insurance proceeds did not violate ERISA's anti-inurement provision.

argument that the safe-harbor provision is unavailable to Matthews, as a matter of law. Construing the evidence and all reasonable inferences in a light most favorable to Matthews, a trier of fact reasonably could find that B–T did not contribute to his policy premiums, and that the company did not "endorse" his disability insurance policies, within the meaning of 29 C.F.R. § 2510.3–1(j).

## 2. Existence of a "Plan"

██ Regarding the *second* step in the Court's three-part inquiry, Matthews' Provident and Guardian policies qualify as "plans" under ERISA, because the documents and surrounding circumstances enable a reasonable person to ascertain all relevant coverage information. As noted, *supra*, such relevant information includes the intended benefits, the intended class of beneficiaries, the source of financing, and the procedures for receiving benefits. *International Resources v. New York Life Ins. Co.*, 950 F.2d 294, 297 (6th Cir.1991). In the present case, the intended benefits include disability insurance. The class of beneficiaries includes Matthews and other B–T policyholders. The source of financing is the payment of insurance premiums by either Matthews or B–T.[26] The procedure for receiving benefits is the submission of a claim by Matthews. Consequently, the Provident and Guardian policies meet the essential requirements to be considered part of a "plan" under ERISA.

## 3. Established or Maintained for the Purpose of Providing Benefits

██ With respect to the *third* and final step in the three-part *Thompson* inquiry, the Court finds a genuine issue of material fact as to whether B–T "established" or "maintained" Matthews' Provident and Guardian insurance policies for the purpose of providing him with disability benefits. The Sixth Circuit has recognized that the "established or maintained" analysis is

similar, albeit not identical, to the inquiry required to determine whether an employer "endorsed" a policy, within the meaning of the safe-harbor regulations. *Thompson*, 95 F.3d at 435 n. 1. As a result, that court has held that an employer "established or maintained" an ERISA plan when it: (1) contracted with a marketing service for the purpose of providing its employees with insurance coverage; (2) obtained such coverage for its employees; (3) provided the coverage to all employees automatically; and (4) paid the insurance premiums. *International Resources*, 950 F.2d at 298; *see also Fugarino*, 969 F.2d at 185 (finding that an employer "established and maintained" a plan by purchasing group health insurance for its employees); *Arbor Health Care Co.*, 181 F.3d 99, 1999 WL 282667 (6th Cir. April 30, 1999) (concluding that an employer "established or maintained" a plan by paying eighty percent of its employees' premiums). Notably, in finding that the employer had "established" an ERISA plan, the *International Resources* court stressed that the company had done more than merely advertise the plan and then refrain from making the premium payments. *International Resources*, 950 F.2d at 298.

In the present case, however, the same genuine issues of material fact which precluded the entry of summary judgment on the "endorsement" issue, *supra*, also preclude the entry of summary judgment on the "established or maintained" issue. Construed most strongly in the Plaintiffs' favor, a trier of fact could conclude that B–T did not "establish or maintain" Matthews' policies. As set forth above, the record contains evidence suggesting that B–T treated Matthews' policy premiums as gross income on his W–2 forms. Therefore, a trier of fact could find that he purchased the policies and paid the premiums. As the Court explained in its analysis of the safe-harbor provisions, the record also suggests that Matthews may have

---

**26.** As noted, *supra*, the Court has found a genuine issue of material fact regarding who

paid the premiums for Matthews' Provident and Guardian insurance policies.

made an individual choice to obtain his own disability insurance, wholly apart from B–T's various benefit plans. In short, a trier of fact could find that, with respect to Matthews' coverage, B–T did nothing more than perform ministerial tasks and submit his premium payments to Provident and Guardian. In reaching this conclusion, the Court does not dispute the Defendants' argument that the record contains substantial evidence supporting a contrary conclusion. It is axiomatic, however, that in the context of summary judgment, the Court must construe the evidence in favor of the Plaintiffs, not against them. Accordingly, the Court cannot conclude, as a matter of law, that B–T "established or maintained" an employee welfare benefit plan with the intent to provide disability benefits for Matthews.

### III. Preemption of the Plaintiffs' State Law Claims

In its analysis, *supra*, the Court has determined that B–T's state law claims against Provident are not preempted by ERISA. As noted above, those claims arise out of B–T's "Business Buy–Out" insurance policy, which *is not* part of an ERISA-governed employee welfare benefit plan. Consequently, B–T's various state law claims against Provident remain viable. The Court also has found genuine issues of material fact as to whether Matthews' Provident and Guardian disability insurance policies are part of an employee welfare benefit plan which is governed by ERISA. Given its inability to resolve that issue as a matter of law, the Court similarly cannot conclude, as a matter of law, that Matthews' state law claims are preempted by ERISA.

The Court intends to bifurcate this litigation and first determine whether Matthews' Provident and Guardian policies are governed by ERISA. If the policies are

governed by ERISA (with the result that Matthews' state-law claims are preempted), the Court will grant him leave to file an amended Complaint, setting forth claims directly under the statute. If the policies are not governed by ERISA, then Matthews may proceed to litigate his state-law claims against Provident and Guardian.

### IV. Conclusion

Based upon the reasoning set forth above, the Motion for Summary Judgment (Doc. # 27) filed by Defendant Provident Life and Accident Insurance Company is OVERRULED. The Motion for Summary Judgment (Doc. # 28) filed by Defendant Guardian Life Insurance Company (Doc. # 28) is OVERRULED.

Counsel of record will take note that a telephone conference call has been set for 8:40 a.m., Thursday, March 2, 2000, to establish a new trial date and

other dates leading to the conclusion of this litigation.[27]

---

27. In a January 15, 1999, Decision and Entry (Doc. # 21), the Court suspended the existing November 8, 1999, trial date, and all other pertinent dates, pending its ruling on the present Motions for Summary Judgment, which were filed after the Court allowed limited discovery on the issue of whether the Plaintiffs' policies were part of an ERISA plan.