**B–T DISSOLUTION, INC., fka Tube Products Corporation, fka TPC Acquisitions, Inc., et al., Plaintiffs,**

**v.**

**PROVIDENT LIFE AND ACCIDENT INSURANCE CO., et al., Defendants.**

No. C–3–98–225.

United States District Court, S.D. Ohio, Western Division.

Sept. 4, 2001.

Toby Henderson, Robert Hanseman, George Lovett, Sebely Shillito & Dyer, Dayton, OH, for Plaintiffs.

William Ellis, Carl Schmidt, III, Wood & Lamping, Cincinnati, OH, Thomas Young, Porter Wright Morris & Arthur, Columbus, OH, for Defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF DETERMINATION THAT INSURANCE POLICIES ISSUED BY DEFENDANTS TO PLAINTIFF STEVEN MATTHEWS ARE NOT GOVERNED BY EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1001, et seq.

RICE, Chief Judge.

This litigation stems from events surrounding Plaintiff Steven Matthews' resignation from his position as a managerial employee and minority shareholder of Plaintiff B–T Dissolution, Inc.[1] ("B–T"). After his resignation, Matthews sought to recover disability benefits under separate insurance policies issued to him by Defendants Provident Life and Accident Insurance Company ("Provident") and Guardian Life Insurance Company ("Guardian"). Provident and Guardian initially paid Matthews' claims for benefits, but they stopped making the payments after determining that he was not "disabled," within the meaning of the policies. Matthews subsequently filed suit in state court, asserting claims for breach of contract and bad faith.[2] (Complaint, attached to Notice of Removal, Doc. #1). The Defendants removed the action to this Court on June 2, 1998, alleging the existence of (1) diversity jurisdiction and (2) federal question jurisdiction, on the basis that Matthews' state-law claims are completely preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq. The Defendants then moved for summary judgment on Matthews' state-law claims on the basis of ERISA preemption. (See Doc. #27, 28).

In a Decision and Entry filed on February 24, 2000, the Court overruled both Motions, finding a genuine issue of material fact as to whether Matthews' individual Provident and Guardian policies are governed by ERISA. (Doc. #34). The

1. At the time of Matthews' resignation, B–T was known as Tube Products Corporation, which formerly was known as TPC Acquisitions, Inc. For purposes of the Court's analysis, infra, these name changes have no significance. As a result, the Court will refer to the company as "B–T."

2. B–T also participated in the lawsuit as a Plaintiff, asserting claims for breach of contract and bad faith against Provident, based on the insurance company's failure to pay a claim under a "Business Buy–Back Disability" policy. For present purposes, B–T's claims against Provident are not relevant. The Court previously overruled a Motion for Summary Judgment filed by Provident and directed toward B–T's claims. (Doc. #34). In so doing, the Court concluded that the "Business Buy–Back Disability" policy is not governed by ERISA. As will be explained more fully, infra, the issue now before the Court is whether two insurance policies issued to Matthews by Provident and Guardian are governed by ERISA. In its prior ruling, the Court found genuine issues of material fact with respect to this question.

Court noted that if the policies are not governed by ERISA (i.e., if they are not part of an "ERISA plan"), then his state-law claims against Provident and Guardian will remain viable. On the other hand, the Court recognized that if the two policies are governed by ERISA, then Provident and Guardian will be entitled to summary judgment on Matthews' state-law claims, as pled.[3]  (*Id.*).

On August 9, 2000, the Court held an oral and evidentiary hearing to resolve the foregoing factual dispute regarding the applicability of ERISA. (*See* Transcript of Proceedings, Doc. # 108). Having reviewed the evidence presented during that proceeding, the Court now sets forth its Findings of Fact and Conclusions of Law.[4]

## I. *Findings of Fact*

At all relevant times, Plaintiff B–T was an "S" corporation, and Plaintiff Matthews was both a shareholder in, and an employee of, the corporation. While a shareholder-employee of B–T, Matthews owned much more than two percent of the company's stock. He also was the owner and beneficiary of separate disability insurance policies issued by Defendant Provident and Defendant Guardian. Matthews made a personal choice, along with B–T Board member James Bryson, to purchase the

3.  If ERISA applies, the Court noted that Matthews will be granted leave to file an amended Complaint, setting forth a claim for benefits directly under that statute.

4.  During the oral and evidentiary hearing in this matter, numerous exhibits were offered for admission into evidence. In particular, Provident offered Defense Exhibits 1, 16, 17 and 18, Guardian offered Defense Exhibits 6, 8, 9 and 10, and Matthews offered Plaintiff's Exhibits 1, 3–16, 18–58, and 60–62. (*See* Transcript, Doc. # 109 at 4, 7, 11–12) (offering but then withdrawing Plaintiff's Exhibit 59). With respect to Provident's offered Exhibits, the Court previously admitted Defense Exhibits 1 and 18 without objection. (*Id.* at 6). Although Matthews has objected to the admission of Defense Exhibits 16 and 17, the Court will admit those Exhibits over his objection. Those Exhibits include summaries of B–T's accounting and payroll practices, as well as numerous financial records. Defense witness Roger Logan testified based on his review of those records, and they also appear to form the basis for opinions set forth in his earlier affidavit. Based on its conclusion that Defense Exhibits 16 and 17 merely expand on Logan's prior affidavit, the Court will, as it previously suggested, admit those Exhibits into evidence. (*See* Transcript, Doc. # 109 at 6). With respect to Guardian's offered Exhibits, the Court admits Defense Exhibit 6 without objection. (*Id.* at 12). Although Matthews has objected to Guardian's other three offered Exhibits (Defense Exhibits 8, 9 and 10) on the basis that they were not timely submitted, his attorney has candidly admitted suffering no prejudice as a result of the delay. (Transcript, Doc. # 109 at 13). As a result, the Court admits Defense Exhibits 8, 9 and 10 into evidence over Matthews' objection. Finally, with respect to Matthews' offered Exhibits, the Court admits Plaintiff's Exhibits 1, 3–7, 11–13, 16, 18–26, 40, 43, 47–48, and 60–62 without objection from the Defendants. (*Id.* at 9). The Defendants have objected to the other Exhibits offered by Matthews, namely Plaintiff's Exhibits 8–10, 14–15, 27–39, 41–42, 44–46, and 49. (*Id.*). With respect to each of the foregoing Exhibits, the Defendants object solely on the basis of relevance. (*Id.* at 7–9). In particular, the Defendants contend that these Exhibits are irrelevant because they pertain to various matters, including other B–T welfare benefit plans, that are not relevant to the Provident and Guardian policies at issue herein.  (*Id.*). Upon review, the Court will overrule the Defendants' objection, as it believes that these Exhibits have some relevance. Among other things, the challenged Exhibits suggest that B–T was actively involved in establishing and maintaining certain other employee benefit plans. Matthews seeks to use this evidence to demonstrate a lack of comparable involvement by B–T in establishing and maintaining his Provident and Guardian disability insurance policies. As will be explained more fully, *infra,* such evidence is relevant to the issues now before the Court. Consequently, Plaintiff's Exhibits 8–10, 14–15, 27–39, 41–42, 44–46, and 49 are admitted over objection.

Provident and Guardian policies, without B–T promoting the policies or otherwise encouraging him to purchase them. (Transcript, Doc. # 108 at 212–13). The two polices were not part of any B–T "executive salary continuation plan," as no such plan existed. (*Id.* at 213–14). Matthews' Provident and Guardian disability insurance polices were unrelated to any policies, plans or programs that B–T may have played an active role in creating or administering. (*Id.* at 216–18). In addition, he dealt directly with the two insurance companies on claims-related issues, without assistance from B–T. (*Id.* at 225).

Despite the fact that Matthews made a personal choice to purchase the two policies, B–T did receive the premium notices for them. (*Id.* at 183, 226). B–T also wrote checks to Provident and Guardian to pay the policy premiums. (*Id.* at 116, 146, 183–84, 226). Furthermore, B–T deducted those premium payments on its tax returns and recorded the cost in its financial records as fringe-benefit expenses. (*Id.* at 30 32, 40, 151–152, 160). Matthews did not reimburse B–T for the premium expense by writing the company a check. (*Id.* at 226). Nor did B–T subtract the expense from Matthews' salary or bonuses as a payroll deduction. (*Id.* at 226–27). To the contrary, as a result of B–T's payment of the insurance premiums, Matthews' gross income actually increased. (*Id.* at 227). In compliance with IRS Revenue Rule 91–26,[5] the entire cost of the premiums was included in his gross income on his 1994–W–2 form. (*Id.* at 78–81, 159, 208).

In late 1994, Matthews suffered a psychological "breakdown," and he was unable to continue working for B–T. (*Id.* at 218).

His last day at work was October 31, 1994. (*Id.*). Matthews subsequently filed his own claims for disability benefits, and he began receiving such benefits under his Provident and Guardian policies. (*Id.* at 117, 219, 224–25). The disability insurance benefits that he received were not reported by him as taxable income. (*Id.* at 219–24). Matthews entered into a formal resignation agreement with B–T in January, 1995. (*Id.* at 218).

## II. *Conclusions of Law*

■ The sole issue before the Court is whether Matthews' Provident and Guardian disability insurance policies are part of an "employee welfare benefit plan" that is governed by ERISA. Title 1 of ERISA defines an "employee welfare benefit plan," as, *inter alia,* any plan, fund, or program established by an employer to provide disability benefits, through the purchase of insurance or otherwise, to participants or their beneficiaries. 29 U.S.C. § 1002(1). "The existence of an ERISA plan is a question of fact, to be answered in light of all the surrounding circumstances and facts from the point of view of a reasonable person." *Thompson v. American Home Assurance Co.,* 95 F.3d 429, 434 (6th Cir.1996). When determining whether a welfare benefit plan is an ERISA-governed plan, a court must undertake a three-step factual inquiry. *Id.* at 434. *First,* it must apply certain "safe-harbor" regulations established by the Department of Labor to determine whether the plan is exempt from ERISA's reach.[6] Under those regulations, a plan is exempt from ERISA regulation if: (1) the employer makes no contribution to the policy; (2) employee participation in the policy is

---

5. Revenue Rule 91–26 will be discussed more fully, *infra.*

6. On its face, the safe-harbor regulation applies only to "group or group-type" insurance programs. *See* 29 C.F.R. § 2510.3–1(j). In its

February 24, 2000, Decision and Entry, the Court concluded that Matthews' Provident and Guardian policies had the characteristics of group-type insurance (*see* Doc. # 34 at 21 n. 16), and the Defendants have not argued otherwise.

completely voluntary; (3) the employer's sole functions are, without endorsing the policy, to permit the insurer to publicize the policy to employees, collect premiums through payroll deductions and remit them to the insurer; and (4) the employer receives no consideration in connection with the policy other than reasonable compensation for administrative services actually rendered in connection with payroll deduction. 29 C.F.R. § 2510.3–1(j). *Second*, a court must determine whether a "plan" exists. In so doing, it must inquire "whether 'from the surrounding circumstances a reasonable person [could] ascertain the intended benefits, the class of beneficiaries, the source of financing, and procedures for receiving benefits.'" *Thompson*, 95 F.3d at 435. *Third*, a "court must ask whether the employer 'established or maintained' the plan with the intent of providing benefits to its employees." *Id.*

In its February 24, 2000, Decision and Entry, the Court resolved some of the foregoing issues. In particular, it held that the Defendants had demonstrated the existence of a "plan," as a matter of law. As a result, the *second* step in the three-part inquiry is no longer at issue. With respect to the *first* step, namely determin-

ing whether the "safe-harbor" regulation applies, the Court previously found a genuine issue of material fact on only two of the four criteria: (1) whether B–T made any "contribution" to Matthews' Provident and Guardian policies; and (2) whether B–T "endorsed" those policies.[7] The Court also found a genuine issue of material fact with respect to the *third* step in the three-part inquiry, namely whether B–T established or maintained the policies to provide benefits.

■ During the August 9, 2000, oral and evidentiary hearing, the Defendants presented evidence on only one issue, which they contend is dispositive of ERISA's applicability. In particular, the Defendants attempted to show that B–T "contributed" to the premium payments for Matthews' two disability insurance policies. According to the Defendants, this contribution precludes him from invoking the safe-harbor regulation, given that it does not apply unless all four of its requirements are met. In addition, the Defendants argue that B–T's contribution to Matthews' premium payments demonstrates that the company "established" the policies for the purpose of providing benefits, thereby satisfying the final step of the Court's three-step inquiry.[8]

7. As to the other two "safe-harbor" criteria, the parties agree that Matthews' participation in his Provident and Guardian disability insurance policies was voluntary, and the Court previously held that B–T did not receive any consideration in connection with those policies.

8. In opening statements, counsel for both Defendants agreed that the present dispute turns on one issue, namely whether B–T contributed to Matthews' disability insurance premiums. Counsel for Guardian set forth both Defendants' position as follows:

Your Honor, I would contend that there's really one issue. When you boil everything down, there is only one issue in front of the Court. And that issue is whether or not [B–T], the employer contributed to the payment

of the premiums for these two policies. That, Your Honor, in my view, is the only issue in front of the Court.

If, in fact, as I believe the evidence will show, the employer did contribute to the payment of these policies, then you have two effects that flow from that, Your Honor. Number one, obviously, one of the criteria of the safe harbor regs has not been met, the first one: the employer has contributed to the policy. It's not met. So the safe harbor regs do not apply.

Secondly, Your Honor, if we can show, as we will, that the employer paid for these policies, as a matter of Sixth Circuit law, that in and of itself is enough to show that the employer established or maintained an employee welfare benefit plan. . . . .

Upon review, the Court concludes that the Defendants have not established the applicability of ERISA to Matthews' disability insurance policies. The evidence presented at the August 9, 2000, oral and evidentiary hearing persuades the Court that B–T *did not* "contribute" to the payment of Matthews' policy premiums, within the meaning of 29 C.F.R. § 2510.3–1(j), the safe-harbor regulation. The Defendants insist that B–T plainly "contributed" to the premiums because it "paid" them. In particular, the Defendants note that B–T wrote the checks for the premiums and deducted them as business expenses. Although these assertions are correct, the evidence also reflects that the *full amount* of the premiums, at least in 1994,[9] was included on Matthews' W–2 forms as gross income. As a practical matter, then, the Court concludes that Matthews, rather than B–T, actually paid the premiums. Although B–T wrote premium checks directly to Provident and Guardian, those funds necessarily first "passed through" Matthews, who was required to report the payments made by B–T as gross income and to pay taxes on those amounts. As a result, despite the fact that B–T wrote the checks, it is apparent that the company did so using Matthews' money. Indeed, if the money used by B–T to pay the premiums were not his money, then he would not have been required to report it on his W–2 forms or to pay taxes on it. Given that B–T paid the premiums with Matthews' own

income, the Court rejects the argument that the company "contributed" to those payments.

In opposition to the foregoing conclusion, the Defendants repeatedly stress that B–T deducted the premium payments for tax purposes. The Defendants reason that B–T must have "paid" the premiums, or else it could not have taken these deductions. Upon review, the Court finds this argument to be unpersuasive. Without question, the premium payments cost B–T a substantial amount of money, and the company properly deducted them as expenses. The flaw in the Defendants' argument, however, is that the money for the premium payments flowed from B–T to Matthews. This is evident from the fact that the cost of the premiums appeared on his W–2 forms as taxable income. As a result, although B–T actually wrote the checks, it did so with *his* money. The fact that B–T deducted the cost of the premiums does not establish that the company "contributed" to them. The Court harbors no doubt that Matthews' taxable salary also cost B–T a substantial amount of money, which the company was entitled to deduct on its tax returns. *See, e.g., Eberl's Claim Service, Inc. v. Commissioner of Internal Revenue,* 249 F.3d 994, 998 (10th Cir.2001) (recognizing that salaries paid by closely held corporations are deductible expenses). If Matthews then used his taxable salary to pay his mortgage, the Defendants could not seriously contend that B–T "contributed" to his mortgage payment.[10] By the same token, the premium

(Doc. # 108 at 8; *see also Id.* at 14 (counsel for Provident agreeing with the foregoing analysis)).

**9.** For present purposes, the critical year is 1994, which is when Matthews allegedly became disabled. It is not important whether B–T contributed to the payment of his disability insurance premiums prior to that year. *See, e.g., Grimo v. Blue Cross & Blue Shield of Vermont,* 34 F.3d 148, 152–53 (2nd Cir.1994).

**10.** In a strict sense, an employer "pays" for or "contributes" to anything that its employee

purchases with income derived from gainful employment. The Defendants do not suggest, however, that B–T would have "contributed" to Matthews' policy premiums if he had used his salary income to write Provident and Guardian a personal check covering the expense. As will be explained more fully, *infra,* the difference in the present case is that B–T wrote the premium checks using Matthews' income, rather than Matthews writing them himself. For the reasons set forth, *infra,* the Court concludes that this distinction is imma-

payments at issue were deducted by B–T and were taxable gross income to Matthews. The fact that the money used to pay the Provident and Guardian disability insurance premiums originated with B–T does not mean that the company "contributed" to those premiums any more than it could be said to have "contributed" to Matthews' mortgage payments if he used his salary income to make those payments. An obvious difference in the two situations, of course, is that B–T wrote the checks to pay the Provident and Guardian premiums, whereas Matthews presumably would write his own check to make a mortgage payment. This distinction is immaterial. In either case, the money used to pay the expense was Matthews' own taxable gross income. As a result, the Court cannot agree that B–T "contributed" to the premiums, within the meaning of the safe-harbor regulation.

In a related argument, the Defendants stress that B–T's payment of the premiums had a "tax consequence" for Matthews only because of IRS Revenue Rule 91–26, which addresses the proper tax treatment when an S corporation pays accident or health insurance premiums for a shareholder-employee who holds two percent or more of the corporation's stock. In essence, Rule 91–26 provides that such premium payments are deductible expenses for the S corporation and must be included in the shareholder-employee's gross income. (*See* Def. Exh. 8).

During the August 9, 2000, oral and evidentiary hearing, counsel for Guardian argued that Rule 91–26 "has absolutely nothing to do with the issue in front of the Court, again the issue being did the employer contribute or pay any part of this premium." (Transcript, Doc. # 108 at 11). Counsel argued that "[t]he [safe-harbor] regulations don't talk about what the tax effect[s] of the fact that the employer paid

terial, at least with respect to the applicability

the premium are." According to counsel for Guardian, the critical issue is not the *tax consequences* of the premium payments, but rather whether B–T *paid* those premiums. (*Id.*). Guardian's counsel repeated this theme during closing arguments held on August 10, 2000, reasoning as follows:

> [I]t's important for you to note when you look at those [safe-harbor] regulations that those regulations [are] focused on what the employer was doing. They don't focus in any way on the taxable consequences of what the employer might be doing as to his employee. You've got to look at the effect on the employer and answer the question, "Did the employer pay for these policies?"

(*Id.* at 19).

Elsewhere in his argument, counsel for Guardian stated:

> Now, the way that Mr. Matthews could have showed that he paid for the premiums is through, first of all, a payroll deduction, which is the procedure that the corporation was using for the other policy plans that [it] had in effect. It wasn't something new. Mr. Matthews, candidly, because he had to, admitted he didn't pay for these through a payroll deduction. He could, Your Honor, have show[n] that, well, I turned around and I wrote a check back to [B–T]; I somehow reimbursed [B–T]. He didn't do that. He admits he didn't do that. Or, Your Honor, [he] could show some action by the board of [B–T] that would indicate that part of Mr. Matthews' compensation would be the payment by [B–T] of these premiums.

(*Id.* at 19–20).

Given Matthews' failure to make the foregoing showings, the Defendants insist that B–T "contributed" to the premiums.

of the safe-harbor regulation.

Once again, however, the Court finds the Defendants' arguments to be unpersuasive. As an initial matter, the Court cannot agree that Revenue Rule 91–26 and its "tax consequences" are irrelevant to the issue of who contributed the money to pay Matthews' policy premiums. As explained more fully, *supra*, examining the tax consequences of the premium payments helps reveal who really "paid" them. Given that the cost of the premiums was included in Matthews' taxable gross income, it is evident that B–T paid the premiums using *his* money. As a result, Matthews, rather than B–T, actually "contributed" to the premium payments.

Additionally, in light of Revenue Rule 91–26, Matthews need not show "some action" by B–T's Board of Directors, indicating that his compensation included the insurance premiums. This is so because Rule 91–26, rather than B–T's Board of Directors, mandated that his taxable gross income included the premiums paid by the company on his behalf. The relevant issue is not *why* the premiums were included in, and paid with, Matthews' gross income. In other words, it is immaterial whether B–T's Board, in the exercise of its discretion, elected to treat the premium payments as compensation to Matthews, or whether Revenue Rule 91–26 compelled the Board to do so. The critical issue is simply *whether* the premium costs were included in, and paid with, Matthews' gross income. For the reasons set forth more fully, *supra*, the Court has answered this question in the affirmative. Therefore, the Court concludes that Matthews, not B–T, "contributed" to the payment of the insurance premiums. As a result, this portion of the safe-harbor provision is satisfied.[11]

As noted above, the Defendants failed to present evidence on any other issues during the August 9, 2000, oral and evidentiary hearing. According to the Defendants, their evidence that B–T "contributed" to the premium payments precludes Matthews from invoking the safe-harbor regulation (without respect to the remaining safe-harbor requirement that B–T not "endorse" the policies), *and* proves that the B–T "established" the policies for the purpose of providing employee welfare benefits, thereby satisfying the final portion of

---

**11.** In opposition to this conclusion, the Defendants rely heavily on *Grimo v. Blue Cross & Blue Shield of Vermont*, 899 F.Supp. 196 (D.Vt.1995). Therein, the district court concluded that the employer, Twin State, had "contributed" to the benefit plan at issue by paying the insurance premiums. In a footnote, the district court explained that the employer made these payments "indirectly," as follows:

> Twin State deducted the insurance premium costs from the corporate earnings which ordinarily would have been passed along to the shareholders. At the end of each year, Twin State provided the shareholder with a bonus equal to the amount of the premiums that had been paid plus any taxes and costs that had been incurred in the process. The payments were made in this manner so that Twin State would be in compliance with IRS regulations governing S corporations.....

*Grimo*, 899 F.Supp. at 203 n. 10.

The Defendants argue that *Grimo* is analogous to the present case, and they urge the Court to follow it. Upon review, however, the Court finds *Grimo* to be unpersuasive for at least two reasons. *First*, the case is arguably distinguishable, insofar as Twin State appears to have paid its shareholders a bonus specifically to account for the fact that its premium payments were taxable income to them. Although Matthews did receive bonuses from B–T, nothing in the record suggests that the company paid him those bonuses to account for the fact that the Provident and Guardian premiums were paid using his taxable gross income. *Second*, insofar as the Defendants insist that *Grimo* is analogous to the present case, the Court finds it to be unpersuasive and declines to follow it, as it fails to address the reasoning set forth herein.

the Court's inquiry. Given that B–T did not "contribute" to Matthews' premium payments, however, the Court finds the Defendants' reasoning to be unpersuasive. Although the Defendants have failed to present any additional argument on the remaining issues, the Court nevertheless will address them in the interest of completeness.

█ As to the last of the four safe-harbor requirements, the Court finds that B–T did not endorse Matthews' Provident or Guardian disability insurance policies. The Sixth Circuit has noted that the hallmark of "endorsement" is a lack of employer neutrality with respect to an insurance plan or policy. *Thompson*, 95 F.3d at 436. Neutrality may be absent when an employer serves as the plan administrator or plays an active role in the creation or administration of a plan. *Id.* On the other hand, when an insurance program is a third-party's offering and is not subject to the employer's control, then it is likely that no endorsement takes place. *Id.*

In the present case, nothing before the Court suggests that B–T served as the administrator of Matthews' two disability insurance policies. To the contrary, he submitted his own claims to Provident and to Guardian. In fact, he dealt directly with the two insurance companies on claims-processing issues. Matthews also made his own personal choice, along with B–T Board member James Bryson, to purchase the Provident and Guardian policies at issue. In addition, the two polices were not part of any B–T "executive salary continuation plan," as no such plan existed. Finally, Matthews' Provident and Guardian disability insurance polices were unrelated to any policies, plans or programs that B–T may have played an active role in creating or administering. In light of the foregoing facts, the Court concludes that B–T did not "endorse" Matthews' Provident and Guardian disability insurance policies.[12] As a result, he has satisfied each requirement of the safe-harbor regulation, and the two policies fall outside the scope of ERISA.

Finally, the Court finds that B–T did not "establish or maintain" Matthews' Provident or Guardian policies for the purpose of providing employee welfare benefits.[13]

---

12. In reaching this conclusion, the Court notes that an employer does not "endorse" an insurance program, within the meaning of the safe-harbor regulation, merely by collecting premiums through payroll deductions and sending them to the insurer. 29 C.F.R. § 2510.3–1(j)(3). Although the Defendants contend that the payment process in the present case did not involve "payroll deductions," the Court concludes, based on the reasoning set forth, *supra*, that it was sufficiently similar. B–T's role in the process involved nothing more than sending a portion of Matthews' gross income to Provident and Guardian on his behalf. Based upon its reading of the safe-harbor regulation, the Court concludes that this limited level of employer involvement does not constitute "endorsement" of an insurance program, and the Defendants cite nothing to the contrary.

13. Parenthetically, the Court notes that this conclusion would remove Matthews' Provident and Guardian policies from the scope of ERISA, even if the safe-harbor regulation did not apply to those individual policies. "A program that satisfies the [safe-harbor] regulation's standards will be deemed not to have been 'established or maintained' by the employer. The converse, however, is not necessarily true; a program that fails to satisfy the regulation's standards is not automatically deemed to have been 'established or maintained' by the employer, but, rather, is subject to further evaluation under the conventional tests." *Johnson v. Watts Regulator Co.*, 63 F.3d 1129, 1133 (1st Cir.1995) (citing *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 976 (5th Cir.1991)); *see also Gaylor v. John Hancock Mutual Life Ins. Co.*, 112 F.3d 460, 463 (10th Cir.1997) ("[T]he fact that [a] plan is not excluded from ERISA coverage by this regulation *does not compel the conclusion that the plan is an ERISA plan*.") (citations omitted).

The Sixth Circuit has noted that the "established or maintained" inquiry is similar to the inquiry undertaken to determine whether an employer "endorsed" a policy, within the meaning of the safe-harbor regulations. *Thompson*, 95 F.3d at 435 n. 1. Frequently, an employer establishes or maintains an insurance program for the purpose of providing welfare benefits when it buys coverage for its employees. *B–T Dissolution, Inc. v. Provident Life and Accident Ins. Co.*, 101 F.Supp.2d 930, 947 (S.D.Ohio 2000). As noted above, however, Matthews actually purchased the polices in the present case, because the premiums were paid from his own income. In addition, the Court has found that Matthews made a personal choice to purchase the policies, wholly apart from any other programs, plans or policies that may have been established or maintained by the company. In short, B–T did nothing more than perform the ministerial task of remitting a portion of Matthews' gross income to Provident and Guardian on his behalf. As a result, the Court concludes that B–T did not "establish or maintain" the two disability insurance policies issued by the Defendants.

III. *Conclusion*

Based on the reasoning and citation of authority set forth above, the Court holds that Plaintiff Steven Matthews' Provident and Guardian disability insurance policies are not part of an "employee welfare benefit plan" that is governed by ERISA. As a result, his state-law claims against the Defendants remain viable in this action.